BRAZOS VALLEY TELEGRAPH & TELEPHONE CO. et al. v. WILSON.*
(No. 5552.)

(Court of Civil Appeals of Texas. Austin. Feb. 14, 1916. Rehearing Denied May 17, 1916.)

ELECTRICITY ⊜⇒19(12)—MASTER AND SERVANT ⊜⇒289(19) — INJURIES — ACTION — QUESTION FOR JURY—CONTRIBUTORY NEGLIGENCE.

In an action by lineman of telephone company against that company and an electric light company for injury from a live wire of the latter company, caused by the negligence of both companies, evidence as to his previous experience and warnings, by appearance of wire and shouts of others before picking up the wire to make the street safe, held to make the question of his contributory negligence for the jury.

[Ed. Note.—For other cases, see Electricity, Cent. Dig. § 11; Dec. Dig. ⊜⇒19(12); Master and Servant, Cent. Dig. § 1110; Dec. Dig. ⊜⇒ 289(19).]

Appeal from District Court, McLennan County; Tom L. McCullough, Judge.

Action by Will Wilson against the Brazos Valley Telegraph & Telephone Company and another. From a judgment for plaintiff, defendants appeal. Affirmed.

---

Spell & Sanford, of Waco, for appellant Power & Light Co. Sleeper, Boynton & Kendall, of Waco, for appellant Brazos Valley Telegraph & Telephone Co. Williams & Williams and Marshall Surratt, all of Waco, for appellee.

KEY, C. J. Appellee Wilson brought this suit against the Brazos Valley Telegraph & Telephone Company and the Texas Power & Light Company, and obtained a verdict and judgment for $7,000 as damages for injuries sustained by him by coming in contact with a wire charged with electricity near the intersection of North Sixth and Columbus streets in the city of Waco, in September, 1913, which wire belonged to the Texas Power & Light Company, and both defendants have appealed. For convenience the appellants will hereafter be designated in this opinion as the Light Company and the Telephone Company.

The Light Company is a private corporation engaged in the business of furnishing electricity for light and power purposes to the public generally in the city of Waco, and maintains a regular system of wires, strung upon poles along the streets and alleys of that city. The Telephone Company is a private corporation engaged in the telephone business in the city of Waco, and maintains a regular system of wires stretched upon poles along the streets and alleys thereof; and the wires of the two companies, at the time in question, crossed each other at or near the street intersection where the accident happened. The plaintiff charged in his petition that each and both defendants were guilty of negligence which caused their wires to come in contact, as a result of which a wire belonging to the Light Company, and charged with about 2,300 volts of electricity, was burned in two, and that one end thereof fell to the ground in a public street. The proof sustains that charge and justifies that portion of the verdict which found that the defendants were guilty of negligence which was the proximate cause of the plaintiff's injuries. In fact, the verdict in that respect is not contested in this court. Both defendants pleaded contributory negligence, and after the evidence closed each requested the court to instruct the jury to return a verdict against the plaintiff, and the refusal to give those instructions is assigned as error, and strenuously urged in printed brief and oral argument, the contention being that the testimony shows, as matter of law, that the plaintiff was guilty of contributory negligence. That question is not free from doubt and difficulty; but, after giving it careful consideration, the conclusion has been reached that the trial court ruled correctly when it declined to instruct a verdict for the defendants, and submitted the question of contributory negligence to the jury. While there was conflict in the testimony in reference to some other matters, the undisputed evidence shows that on the occasion in question the plaintiff was employed by appellant Telephone Company as a lineman; that on the day of the accident the crew of which he was a member was engaged in working for the telephone company about one block away from where the wire of the Light Company fell in the street, and that some one notified the plaintiff and one of his colaborers named Geo. Reynolds that the wire in question had broken and was down in the street. Thereupon the plaintiff and his companion Reynolds went at once to the place designated, and soon after they arrived there Reynolds ascended a telephone pole and cut a telephone wire for the purpose of preventing a contact between it and one end of the broken light wire, which was suspended in the vicinity of the telephone wire. At about the same time the plaintiff, Wilson, ascended a pole on the opposite side of the street belonging to the Light Company, and from which the other end of the broken wire in question was suspended, for the purpose, as testified to by him, of removing that wire from the street. When he had reached a point somewhere between 6 and 10 feet from the ground, the plaintiff caught the broken wire with his left hand, upon which he had an ordinary glove, and attempted to cut it in two with a pair of uninsulated pliers, which he held in his right hand. The result was that he received a severe shock, which rendered him unconscious, caused him to become entangled in the broken wire, thereby sustaining severe burns upon his left arm and elsewhere. He fell to the ground, was rescued by others from contact with the wire and carried to a sanitarium, where ultimately it became necessary to amputate his left arm in order to save his life.

It would be a difficult matter to state in condensed form the reasons given by the plaintiff for attempting to remove the wire from the street, and we therefore quote as follows from his testimony as set out in the statement of facts:

"I was taking down some cable that morning. Mr. Gray put us to taking down some cable, and when we got the cable taken down, he wasn't anywhere around, and we were standing in under the awning out of the rain, down on Sixth street. I don't know where Mr. Gray was. About 20 minutes before that I seen him go in the house, I don't know whether he came out or not, down on Sixth street. It was about a block from where we were under the awning to Columbus street. We were on the left-hand side of Sixth street going out. While we were there under the awning some one came down the street and told us there was some wire down in the street. I disremember whether the man that told us that was walking or riding. He told Geo. Reynolds and myself. At that time Geo. Reynolds and I were within 5 or 6 feet of each other, standing out of the rain. We then came on up the street. Dave Gray was not there then. We came on up Sixth street towards Columbus street. We came on to the corner of Sixth and Columbus streets.

"I walked up there on the corner and there was a man and lady, I reckon there was a man and a lady in the buggy—vehicle there and the

horse scared—and they told me to clear the wire out of the street; asked me if I would get the wire out of the street; and I looked at the wire and started over to the pole to get it out of the street, but it was an insulated wire, so I climbed up the pole to take it out of the street, and I got hurt. There were other wires on the pole which I climbed up; there were some large wires running north and south on Sixth street. There was a transformer over on Seventh street down Columbus. I don't know where there was any other transformer. I don't know what size wire it was that was in the street, but it was a small wire, though. As to whether I saw the part of the wire that was on the ground, I just noticed the wire laying in the street, and seen it swinging from that pole; it was an insulated wire. I don't recall the shape the insulation was in, I just noticed it was an insulated wire. I did not know that the wire was charged.

"The wire which Mr. Williams now holds in his hand looks to be about the same size as the wire which was in the street, about the same size as a light wire that goes into a house. I understand that a wire that goes into a house carried 110 volts. I know that 110 volts of electricity won't hurt a man very much. The day before I dragged—I was breaking down some wire and it had slacked down onto the drop that was going into the house, and I felt something on it. I knew it was not the telephone, because it was cut loose and was dead, and it bound to have been down on that; I could feel it. Nobody told me how much voltage was on the wire that I dragged this one across. I have heard people say that there was 110 volts to light up a house.

"With reference to whether a big wire carries the most voltage or a small one carries the most voltage, my opinion is that the big wire does. At that time I thought the big wires carried the greatest voltage. I did not know whether the wire was apportioned to the voltage in size. Before I went up the pole I noticed there was a big wire up there, and seen the transformer down Columbus street. I thought if the wires would be charged at all, it was 110 volts, that transformer down there broke loose would be feeding that way. I noticed these other wires, and didn't see anything like electricity on this wire, I thought it would be safe it (if) I would go up the pole. I had my gloves on. I seen the big wires, and thought if there was any heavy electricity I thought it was on those wires. When I said I thought if (it) was feeding, I meant by that I thought that is the way the electricity was coming from. I thought it was coming from Seventh street. I thought the wire I was fixing to take hold of was dead.

"I do not know where Geo. Reynolds was at that time. I didn't look at the part of the wire that was on the ground long, I just glanced at the wire and started on to move it; the horse was scared at it, and I wanted to get it out of the way, so there would not be any runaway, or something. Yes; I thought it was an electric light wire. I was working for the telephone company. The reason I went there and went up on the electric light pole, I thought it was our duty; I thought probably our wires had caused the trouble and caused that wire to be down or something, and I thought it was my duty to take it out of the street so people could pass.

"Geo. Reynolds came up the street part of the way with me. I don't know how far he came. I don't know whether he was around close where I was or not. When we were coming up the street there we were on the left-hand side of the street coming this way, right at the corner of Columbus and Sixth streets. We were close to the corner. No one said anything to me; only this party in the buggy. It was a man that told me to get the wire out of the street. There might have been several people around there, but I don't remember seeing—I wasn't paying any attention about it after this man called my attention to the wire. I then went on to take the wire out of the street, and went up the pole. I don't know whether I ever taken hold of the wire or whether it jumped onto me, or what happened. I went up the pole between 6 and 10 feet. I don't know whether I was going to drag the wire out of the street, or whether I was going to tie it up around the pole; I was going to try to get it out of the way so this man could get by. I thought the insulation was put on the wire for protection, to keep from hurting any one. I thought the higher the power the wire carried the better insulation it would have. I didn't think if I took hold of a 2,200 volt wire off of the ground that was insulated it would hurt me; I didn't know. I didn't think it would hurt; I thought the insulation was put there for that purpose. Q. I will ask you to state whether or not you would have taken hold of that wire if you had known it was charged with 2,200 volts if it was not insulated so as to protect you? A. No, sir. The reason I went up there to take that wire out of the street was because I thought it might cause trouble. I thought maybe it was a charged wire, or something might get into it. I thought if it had anything on it at all, it would not be but 110 volts; it being a little wire. I thought I could handle it if it was just 110 volts by being on the pole. I had dragged a wire across 110 volts the day before.

"After I got on the pole the last thing I remember was with reference to fastening myself to the pole. I had on climbers. 'Climbers' are spurs to climb poles with. They are fastened around the ankle, around the leg and strapped around, iron around the bottom of your foot. There is one on each foot. I also had a belt and safety. The belt is to carry the tools in. The safety belt goes around the pole and fastens in the belt; it goes around the pole each side and is fastened in the rings to my belt. I have one belt around my waist, then I have another belt I put around the pole and fastened on each end to the belt around my waist. I did that in this instance.

"I do not know whether I reached the wire the first time I attempted to or not. I do not know whether I attempted to reach it more than one time. I probably reached out to see whether I was high enough to reach it, high enough on the pole, something like that. When I stopped I remember putting my safety around the pole, and that is all I remember. I don't think I had any pliers in my hand, because I had just fastened my safety, and that is all I remember. Ordinarily I would have taken my pliers out before I got hold of the wire. I did not feel any electricity until I was done knocked. I do not remember the electric current hitting me. I just remember getting knocked; I couldn't tell whether it was somebody hit me or what it was. I do not know whether I had actually hold of the wire or not. As to what happened to me, I fell to the ground, so they say. I don't know anything about it; that is the last I remember being on the pole for 12 or 13 hours, probably longer. The next time I come to I was at the Provident Sanitarium. I would judge it was between 10 and 11 o'clock that this happened, I don't hardly know. I came to the next morning between 3 and 4 o'clock. The first thing that I knew I remember seeing a couple of boys that I knew.

"I know Bill Lofton. I saw him this morning. I do not know whether they were there at the time I fell. Bill Lofton at that time was working, I think, for the Texas Power & Light Company. I did not see him before I got hurt that morning. I know Guy Robinson. I did not see him before I got hurt. Nobody holloaed at me loud enough for me to hear. I never heard anything. I had pretty good ears. * * *

"The electric wires on the top of pole No. 1, the one that I climbed, were a great deal bigger

in appearance than the wire which I was supposed to take hold of.

"I worked as lineman in the town of Marlin for the Southwestern Telephone Company. I worked for that company as lineman in Marlin about a month. I worked as a lineman at Yoakum. I worked for the Bell Telephone Company. I worked as lineman at Yoakum about a month. I strung wires out of Lampasas, just started there. I was working for the Bell Telephone Company then. I haven't worked in any other towns. I just go through there; go through other towns stringing wires. I hadn't done any construction work in these others; only strung wires through them. I strung wires through Moody, McGregor, and into Gatesville, through Bartlett, Holland, Granger, and several other towns. I was employed by the Bell Telephone Company about 3½ years, and had worked a short while for the Brazos Valley in this town, and a short while for the Western Union and the Sap (San Antonio & Aransas Pass Railway) Telegraph Company. Yes, I guess I worked about 3 years for the Bell Telephone Company. I think that Marlin, Yoakum, Moody, Gatesville, and Lampasas all have electric light systems. Marlin and Yoakum and Gatesville have. I guess the others have. They are little towns, I only worked through them in the day time: I wouldn't be for sure whether Moody has electric light system or not; I don't know. Yes; I am sure that Marlin, Yoakum, and Gatesville have. Yes, sir; I suppose there were electric light wires strung along the streets in Marlin, Yoakum, and Gatesville when I was working as a lineman stringing wires in and through those places. Q. Well, I will ask you if it is not a fact that at various points in those towns the telephone wires would cross the light wires or to the contrary, light wires cross the telephone wires. A. Something like house drops. Yes, there were leads down the streets of those towns. I don't know whether there were any primary wires there or not. I didn't know what primary wires were. If there were primary wires there, I suppose they were there to furnish the current or furnish lights throughout the residence part, I suppose that is what they are there for. Yes; I know it is necessary to get the electric current distributed through the town in order to furnish the lights for the electric power. I did not know that in doing that certain wires carry a heavier voltage than other wires. Yes, sir; I thought that wires lead off from the main leads into the house; thought that lead carried the heavier current of electricity. I thought where the main lead was was supposed to carry the heavy lead. I thought when that broke off that only had a small lead on it. In those various towns I did not know one wire from the other; only just house wires. I understood that the larger wires carried the heavier voltage. I did not think that the wires that run into the houses carried as much voltage as the larger wires. Yes; in the towns which I have worked I thought the larger wires carried the most voltage. I thought it was dangerous to come in contact with wires that carried heavier voltage.

"The voltage carried on the telephone wires for the companies which I have worked for was harmless. There was no shock or effect of the electric current felt at all only just in the ringing of the telephone, something like that. That would be just slight. It would not be dangerous. I had had no experience in the handling of electric light wires. I had never worked for a company that furnished electric lights. I knew that wires on which large currents were transmitted were dangerous to handle. Q. You ascertained that fact, or that information came to you, did it not, while you were working in Marlin and Yoakum and Gatesville and other places where there were electric light lines? A. Well, during the time I worked in Yoakum that was a dead town in the daytime—didn't have any current

on only at night—and at Gatesville the same way when I was there. I think Marlin was a live town during the daytime. I knew that when the electricity was turned on, the wires in Yoakum and Gatesville, that they were supposed to light up the town. I also knew that whenever the electricity was turned on from the power house or any of these light systems some of the wires were dangerous. Q. You were instructed or informed, were you not, in working as a lineman that whenever you crossed or came near the light wires of the respective electric light companies, why that you were to exercise caution and care and not come in contact with those wires, were you not? A. Only with the men, the boys we were working with. Q. They all recognized that, didn't they. A. Practically; yes, sir.

"We would avoid coming in contact with electric light wires, and that was because of the recognition of the danger of the electric current that was conveyed over the electric light wires. I had been in Waco for something like 16 days before this accident happened. Yes; I could say that during that time I was aware that electric light leads run up a large number, if not practically all, of the streets in the city of Waco. Yes; I was of the opinion that those carried dangerous currents of electricity. As to whether I knew that the wires here in Waco were charged practically the entire time, day and night, I didn't know about the residence part of town. I didn't know whether they were up in this part of town or not. I didn't know whether they could turn on the electric lights in the residences any time during the day.

"Yes; I have testified that I was under the impression that the wires that run into residences, the electric light wires that run into residences, carried 110 volts. As to what care I would exercise when I was working around those wires, when I would be working around anything like that, I would try to stay in the clear and keep in the clear and not take any chances. I took precautionary measures all the time from coming in contact with any light wires at all because of the recognition of the probable danger that would control.

"I had been working something like 2 or 3 or maybe 4 days on North Sixth street. I had worked up about that churchhouse or school buildings, negro school buildings, worked down this way to Columbus street. The negro church and schoolhouse is on the left-hand side of North Sixth street going up Sixth from Columbus. I don't think I had worked along below pole No. 6 on the west side of Columbus street at all. As to whether I had been informed as to the condition of the lead there as to whether or not the wires had been taken down south of that pole prior to the date of this accident, I don't think there had been any wires taken down. We hadn't taken any down across Columbus street. I do not undertake to tell the jury as a fact that there had not been any of the wires taken down south of that pole prior to the accident by somebody else. I know they were not, they were still there. The telephone wires on the west side of Sixth street south of pole designated as No. 6, which is located near the auditorium, and the cable were still up there when I got hurt. In my direct examination I stated that I had been engaged for a day or two prior to the date of the accident in taking down telephone wires on the west side of Sixth street and north of Columbus.

"We had taken the cable down on Sixth street coming this way. With reference to what point we had started and to what point we had taken them down, we started away up there by those negro churchhouses taking the cables down, and I disremember how far we come with the cable, but I know we were coming all the way with the wires and I think we were coming all the way with the cable. Q. I will ask you what is your recollection as to whether the

cable was ever taken down, whether you also took down the messenger wire from which the cable was suspended or left the messenger wire on the pole. A. Well, I don't think we taken down any messenger wire. At the time of the accident I think the messenger wire was still on the post. As to how far up Sixth street on the west side of Sixth street did the messenger wire extend, I guess it was run all the way through clean up to those churchhouses; we hadn't taken down any messenger wires; we had taken the cable off. They were going to put some new cable there. I am not sure that the messenger wire was intact all the way up the lead to at least up to the negro church. As to my being exact, I don't know. I couldn't say that the messenger wires were still intact from which we had taken down the cables; I know we taken down the cable way this side of the creek. I didn't take the messenger wire down, I don't know whether the rest of them taken it down or not. At times we would be separated, some on one end and some on the other end. Yes; I worked up to Columbus street and stopped. I don't remember whether the messenger wire was still intact on the poles north of the point where we stopped the night before the accident. I guess it was still there. No; I do not undertake to say to the jury that it was not there. I know the messenger wire was not taken down the same time the cable wire was. I was taking down cable that morning that I got hurt. We started to taking down the cable, that morning before I got hurt, across the creek. Yes; the morning of the accident we started to work taking down cable north of Barron's branch. We had taken the cable down this side of the creek there that morning. I know where the little market is. We had taken it down just north of that point. I think we had taken the cable down this side of the market the day before. We started across the creek to take down the cable the morning of the day of the accident. That was beyond the market, north of the market. No; I am not mistaken when I stated that we had taken cable down to a point this side of the market when we stopped the day before; there was some cable left up there, and he put us to taking that down. He said, 'Take that down.' In taking down the cable we were working south, this way. We were coming this way. As to whether the cable was in a continuous line or whether it had been cut, it had been cut; it was a cable left on the messenger. I think the cable had been cut about the third or fourth pole this side of the market there, somewhere along there. I don't know how far that would be on the other side of Columbus street; I don't know how many poles there are there. The cable had been taken down between Columbus street and the market before I got hurt. Q. When you left work the night before this accident, where was the cable suspended north of Columbus street? A. Well, if there was any there it would have gone on down close to the market there somewhere in two or three poles of the market. There was a can top there; I don't know whether there was any cable working out of that can or not. There had not been any cable removed south of the three or four poles the day before; that had been taken down about two or three spans at a time. Q. Then the cable had been taken down, all the cable north of the market had been taken down, to a point just a short distance to the north of the market? A. Except a little bit left up there the night before. Q. Then there was a piece of cable then from about the market down to where it was cut about three or four poles this side of the market that were suspended there that had not been taken down the day before? A. I understand the question all right, but I don't remember whether we taken that cable down before I got hurt or not; I don't remember whether it was taken down or still there.

"At the time I got the information that attracted my attention to Columbus street, the messenger wire was somewhere about the market, somewhere or probably across the street to an anchor pole; I don't remember whether they had taken the messenger down above there or not. I do not know who the man was that came to where Reynolds and I were standing and told us about the wire at Columbus and Sixth streets. As to whether he was walking or in a buggy, I could not say how he was coming; he was out in the street, and we were under the awning out of the rain. He said there was some trouble or wire down, 'You had better go down and see about it.' With reference to whether he was a man employed by the telephone company or by the light company, I could not say; I never paid any attention to him, I just heard the remark, and George said, 'Let's go,' and we started out. I had probably seen the man before. No; I did not recognize him as a man that I had seen before, because I never paid any particular attention. No; he did not come to me as any one in authority there at all. He just casually remarked that there was a wire down up there. As to whether I asked any question of Mr. Gray, he was not there. We were waiting on him then. Q. As a matter of fact, you had not spoken to Mr. Gray prior to the time, according to your testimony, that you started up towards Columbus street? A. No, sir; he put us—he give us a little job down there, and we had finished that, and he was gone. I didn't see him any more. I seen him go in a house. I don't know what he went for. I never noticed whether he came out or not. I saw him go in the house. We were standing down there close, and thought he would be back out and give us some more work to do. Before he came out we was notified about this trouble. When we left the place where we were at work when Mr. Gray left there, on North Sixth street, and came back to Columbus, I thought I was acting under instructions and directions of Mr. Gray, I thought he would be there. No; I did not see Mr. Gray. From the time I got the information and left there until the accident, I never had any conversation with Dave Gray. I never asked Mr. Gray whether I could come on down to Columbus street. I did not see Mr. Gray. Mr. Gray did not give me any directions to go down there.

"I do not know whether the party that told us about that wire being down in the street was acting for the telephone company or not. I did not ask him. I did not ask him if he was acting for the Texas Power & Light Company. The man just said there was some trouble up there, and we had better go up there and attend to it. Mr. George Reynolds was with me at that time.

"In coming back to Columbus street we were on the west side of Sixth street. I crossed the street right on the corner of Sixth and Columbus. The buggy was on Sixth street. I guess it was driving down Sixth street; I don't know whether they intended to turn up Columbus street or go on down Sixth street. As I turned the corner, I was kind looking around to the top of the pole and I heard this man say something about it, and I looked around and seen his horse was scaring, and he asked me if I would move that wire and let him get by. The horse and buggy were south of where Sixth street comes into Columbus street. They were just ready to cross Columbus street, right at it like. He was traveling out north, or going to turn up Columbus street, I don't know which. The man with the horse and buggy was south of where the wire was in the street. I was within 10 or 20 feet of the man and the buggy. As to how far the man with the horse and buggy was south of the wire, the horse was right upon it, and as soon as he seen it he jumped back and cut the wheel around in under the buggy; the horse was scared at it. He

happened right on it, and it scared him. I was just off of the corner of the sidewalk, part of the way in the street; just had come out of the street. I was still on the west side of the street—I was coming up from the north end of Sixth street. When I first noticed the wire it extended very near all the way across the street. With reference to where the end of the wire that was lying in the street from the west side of Sixth street, I never paid any attention to the end of the wire. I just glanced down at it, and seen the horse was scared at it, and I started on to move the wire. I don't know that I ever saw the end of the wire; I don't know that I paid any attention to it at all. I don't know how many feet it was from the pole which the wire was attached to to where it was broken. My idea would be that it was about 50 feet from the top of the post to the end of the wire; it must have been about 50 feet.

It is not a fact that there was a noise emitting from that wire that I heard. I never heard nothing. Yes, sir; my hearing was good. The wire was lying there in the street perfectly still. It was not moving; it was perfectly still. I did not see any sparks emitted from the wire. I did not hear any sound. As to how near to the wire I passed in going to the post, I guess I walked under the wire from where it was on the top of the pole. I walked right across the street to the pole. I was not aware that there was any electricity in the ground as I walked along there. I did not feel any effect at all. Yes, sir; I heard Mr. Robinson's testimony here yesterday. I never felt a thing, and never seen anything that indicated electricity.

"With reference to whether I thought it was a dangerous thing for me to undertake to handle an electric light wire, I did not think it was dangerous to handle that wire, because it was lying perfectly still. I never seen any electricity or nothing coming out from it. I didn't think it would be dangerous to handle that wire, because it was a small wire and insulated. I thought it was the same size wire and carrying the same current I dragged some wire over the day before. I thought if I could get on the pole, I could drag it out of the way or cut it off. I don't know whether my mind was to cut it off or drag it out of the way. I intended to tie it up around the pole or cut it off or drag it out of the street. I tell the jury that I did not think there was any danger in handling that wire. Yes; I thought I could pick that wire up and there would be no danger at all. The reason I did not cut it off in the street was because I thought I could get on the pole, and I wouldn't get away. It was like on the day before; if it had any it would be 110 volts. I did not realize that there was danger in handling 110 volts. I thought if there was anything at all on it, it would not be over 110, because I dragged a wire over same size the day before. I could feel it on there. I thought that probably maybe it was a dangerous wire anything like that I would be on the pole, and I would be safe. I thought when you are on the pole or had on gloves you would be safe in handling the wire. No; I didn't think 110 would hurt me at all. The ground was very muddy. It had been raining for several days; the ground was very wet. The pole was wet. The reason I did not pick it up out of the street, I thought I would take it and drag it back out of the street and tie it up around the pole. Maybe I didn't want to cut it off; something like that. I knew it wasn't our wire. Yes; I thought it was safer to be on the wood pole than on the ground; even if it was 110 I wouldn't get as much on the pole as I would on the ground. Yes; my going on the pole was in response to a suggestion that I would be in less danger in handling that wire on the pole than trying to handle it on the ground.

"I heard Mr. Robertson's testimony when he said I had my pliers in one hand and had taken hold of the wire with the other hand, and was reaching out with the pliers and was going to cut the wire. I don't know whether I was in the act of cutting the wire when I sustained the shock and was knocked to the ground. The last thing I remember after getting on the pole was putting my safety around the pole. I don't know whether I ever got my pliers or whether I ever taken hold of the wire, turned it loose and got it again, or what. I do not say as to whether I ever got in the act of cutting, or attempting to cut, that wire; I don't remember. The last thing I remember was fastening myself to the pole. No; it is not a fact that I had in my mind that I would climb up the pole and cut the wire with my pliers. I had in mind that I was going to remove the wire, drag it off, or cut it after I got it dragged out of the street out of the way of this man in the buggy. I might have cut the wire then or wrapped it up around the pole. It is not a fact that there was a noise emitting from the wire which attracted a large number of people there. I never heard it. My hearing was all right at that time. I never heard it at all. I did not see any people attracted there when I went up the pole. I hadn't noticed any one there except those two in the buggy as I was coming up North Sixth street, and when I went up the pole. Just before I reached out to take hold of the wire I did not see anybody else around there.

"I did not ask any one whether it would be safe for me to take hold of that live wire. No one told me to take hold of it. Yes; some one told me to take hold of the wire. The man asked me would I remove the wire so he could get by. That was the man in the buggy. I did not know who the man was. I have never seen him since to know him. I don't know whether he was connected with either one of these companies. I have never heard that he was.

"With reference to whether I stated in my direct examination that I was up pole No. 2 the night before the accident, I was up there that evening. I was up pole No. 7, the telephone pole just north of Columbus street the afternoon of the day before the accident. It must have been between 4 and 5 o'clock that I was up on that pole. I couldn't say whether it was nearer 4 o'clock or nearer 5 o'clock. We quit work about 5 o'clock that evening. Q. How many light wires were there running across Sixth street from pole 1, that is, the pole where this accident happened to pole 2, there of the light company at the corner of the auditorium? A. I couldn't say how many there were. I don't know.

"As to whether there were only two wires, there might have been two, but I don't know it to have been a fact. The wire that I saw, the wire of the size of this wire, ran across North Sixth street on the light wire, was such size that I thought had the same current that went into houses, 110 volts. I did not think there was any danger from 110 voltage in getting hurt. Q. What wires, if any, was Turner referring to that night, if you know, when he spoke about the telephone wires being in trouble? A. He was on the telephone and told Mr. Gray that he had better pull the slack out of those wires, if not it was liable to cause trouble. Q. What things did he refer to? A. That the telephone wires would be apt to get down on the light wires of the Texas Power & Light Company. One of those wires that were down the next day I thought it was 110 volt wire. I didn't think anything about it that evening. I guess that was the wire; I don't know whether that was the particular wire or not. There were wires running right across there. Yes; there were four or six cross-arms on that lead up North Sixth street. The messenger wire was underneath the cross-arm. As to whether it is a fact that the messenger wire ran a short distance under the lowest cross-arm or lowest

overhead wire of the telephone company at that point, I don't know what the distance was. Q. But a short distance below. I will ask you if it is not a fact that the light wire—light wires running across from pole 1 to pole 2—run between the lowest cross-arm carrying the overhead wires and the cable and the messenger wire from which the cable was suspended? A. No, sir; I think the wires run in between the telephone wires, some over it and some under it. I think it is a fact that it run through the telephone wires. The next telephone pole was shortly south of that. I think that the light wires run through about between the bottom arm and the next arm, something like that, about one arm wire under the light wire. As to whether I had ever observed the crossing of the light wires with particular care to ascertain the relative position of the wire, I hadn't worked on this side of Columbus street. I had not had to dodge those wires any, just worked up to them. I noticed the wires being out there.

"The telephone wires are fastened to the insulators on the cross-arms. As to whether I have had any information which I have gained by any personal experience as to how wires carrying current of electricity should be insulated in order to afford protection, only just hearing linemen talk. I have heard them say that the higher power the wire carried the better insulation they had. From my experience I knew nothing about how much insulation was necessary for a wire to have which carried a current sufficient to burn a light in order to protect one against handling. If you should attempt to cut a wire that was insulated, when you cut to the metal it would amount to something. No, sir; I don't think that I was undertaking to cut this wire. I was going to do something. I don't know whether I intended to cut the wire. I don't know what I was going to do. I intended to get it out of the way. After I got it tied, I don't know what I intended to do with it. I was just getting it out of the way so they could pass. * * * Q. During the time that you were engaged in constructing those telephone wires, didn't you frequently construct them in the same territory where electric light wires were? A. Well, yes; there would be wires strung around. In a good many places the telephone wires would cross the electric light wires. I knew those electric wires were dangerous to get against the wire, but I didn't think they were dangerous with the insulation, I thought the insulation was put there to prevent that. I did not know that there was more or less danger even with the insulation on them, I never had enough experience to know that. When I would happen where those electric light wires were, I would avoid coming in contact with them. I tried to stay away from them. The reason I did that was because the wires was nothing to me; I knew they were electric wires. Because they were electric wires I did not want to handle them. I had been told they were dangerous. I would handle them if it had been necessary to handle them; I thought the insulation was to keep the electricity. I knew they were dangerous if it wasn't for the insulation. I did not think they were even dangerous some times with the insulation. I don't know why I avoided coming in contact with them. I can't explain.

"I went to work the morning I was hurt about 8 o'clock, and worked up until about something after 9. I was standing down there, and somebody told me there was some trouble up at the corner of Sixth and Columbus streets, and I walked up there. George Reynolds went up there with me. Yes, he is called 'Little' George. I never knew him by the name of 'Shorty.' We called him 'Little' George all the time. He went by the nick name of 'Little' George. Little George and I walked up to the corner. I won't say the horse and buggy was standing there while we were walking down the street. I guess they had just drove in. Just as I walked up, I wasn't paying any attention to what was in the street, and I looked around to see what I could see, and I saw the horse, and the man asked me if I would move the wire. The man asked me to come and move the wire. As to whether I saw the wire about the time the man spoke about it, I hadn't been paying any attention. I hadn't seen that until the man spoke to me. The man spoke to me, and asked me to come over and move it. I did it in order to accommodate him and to keep the horse from tearing up the buggy. I did it because he asked me to do it in order to keep the horse from turning the buggy over. I wanted to get the wire out of the street away from other people. I thought about that right then. As to what else was there for me to get it out of the way, I don't know, I didn't see any one else. I didn't notice any one else. I didn't think it was right to leave that wire lying there in the street, and that was my reason for moving it. I did not think it was right to leave that wire there in the street; those were the reasons for my doing that. I don't know they were the only reasons or not, I wanted to get it safe from everything and everybody. Yes; I wanted to take it out of the way of that man and to keep the horse from turning the buggy over. Those were my reasons. I don't know that there were other reasons. I don't know of any other reason. Yes; I thought I was doing the public a service and the telephone too, I was working to their interest. I was working to the interest of the telephone. I thought I was doing the telephone company an important duty. I went up that pole because I thought it was safer to be on the pole; if there happened to be any juice at all on it, it would be safer to be on the post than on the ground. I did not know it was dangerous. The reason I did not take it aside without getting upon the pole was because I did not want to. I wanted to take it out of the street and go up there and tie it upon the pole or something. I wanted to climb the pole. If there should be any electricity, it would be safer for me on the pole. I climbed the pole to move that wire. The reason I laughed was because you asked me the same question, and me telling you the same thing. As to why I did not move the wire out of the street without getting on the pole was because I thought that if there was any electricity on it, it would be safer on the pole. I wanted to get on the pole; in case there was any electricity it might not hure me. I did not think there was electricity on it. I thought if there was, I would be safer on the pole. I thought if there was any electricity, it would only be 110 volts. With reference to why I did not move it from the ground if I thought that 110 volts would not hurt me, I did not want to get that much. No, sir; I didn't want to get that much even. Q. Did you think whenever you cut into that wire through the insulation with your pliers struck the wire that you would get a shock if there was electricity in that wire, or not? A. That is what I went on the pole for; I thought that would save me. I was on the pole and off of the ground. I didn't think it would hurt me. Yes; I thought if there was electricity on the wire, and when I cut through the insulation with my pliers the electricity would be communicated to me, if I was in connection with the ground. I did not think it would if I was on the pole. I did not know it would do it on that wet pole. I knew the pole was wet. No; I do not remember whether I actually caught hold of the wire. I don't remember whether I had my pliers in my hand or not. Yes; several other things might have happened just about that time that I did not remember. Yes, Little George could have been there in that neighborhood, but I did not see him anywhere. I don't remember seeing him. I don't think I had my pliers in my hand. I don't remember about Little George being right there. If Little George spoke to me just before I took hold of

the wire or got the shock, he did not talk loud enough for me to hear him. I never heard him, I am positive about that. I do not think he spoke to me. I don't think I could have forgotten it. If I had heard him, I would not have forgot. I certainly would have remembered it if he had spoken to me and I had heard him.

"I did not see any indication that there was an electric current in that wire when I got to the intersection of Columbus and Sixth streets and started towards that pole. I saw absolutely nothing. I did not see a spark; I did not see the wire move. I did not see any indication that it was live and had a current on it. Yes; the current was so stong that it knocked me off the pole to the ground. The wire was laying perfectly quiet on the ground. It was resting on the ground. It was muddy and wet there where the wire was lying.

"I did not stay at the corner of Sixth and Columbus long before I started up the pole, just a little while. I came up and looked around where the trouble was. I couldn't say whether I halted there a minute or two or a half of a minute. Yes; I halted there at the corner of Sixth and Columbus and looked around to see what I could see, and listening to see what I could hear. The first that attracted my attention was the horse and buggy, and the horse was shying and turning and cutting up, and the man asked me, 'Will you come and move this wire?'

"I had not mended any other light company's wire since I had been working for the telephone company, I had never had any occasion to. I had not handled any of the electric light company's wires at all since I had been working here for the telephone company. I had not helped to rearrange any of the light wires. The gang I was working with had not misplaced any that I know of, absolutely none, no, sir.

"When I climb a pole I look up. I thought a high-power wire had sufficient insulation on it to * * *. With reference to my working in different towns, and whether I know whether the old or new insulation, sometimes one insulation is good on a wire and sometimes it is bad. I have noticed stringy insulation on the wires; I guess weather-worn and rotten. I do not know whether this wire was that way or not. It would wear the insulation to drag a telephone wire across any other wire, because it would drag and wear the insulation off from the light wire.

"I was afraid to drag the wire across the electric light wire, because I was afraid to wear the insulation out, and when it came in contact with it it would charge the telephone wire."

J. B. Earle, manager of the Telephone Company, and an expert electrician, testified that a current of 110 volts of electricity is used to light ordinary residences, and that they used a No. 10 wire for that purpose. He also testified that at the place where the accident happened the ground slopes three ways, so that water would not stand in great volumes, but might collect and stand in the street, and that if the wire in question made a perfect connection after it fell, it might have remained still and not arc-ed. And he further testified that if the wire in question had been feeding from Seventh and Columbus streets, the end which fell in the street would have been dead, which meant that it would not have been charged with electricity, and therefore the plaintiff would not have been injured.

Dave Gray, a witness for appellants, and an employé of the Telephone Company, testified that it was a custom existing between the two companies that when one interfered with the wires of the other, it was the duty of the party interfering to correct the trouble, and that when one of his crew caused a trouble, he instructed his men to repair it or remove it, and that he had so instructed the plaintiff, he being the foreman under whom plaintiff worked.

Guy Robertson, an employé of the Light Company, who had been notified of the trouble and was going to see about it, testified that when he was 200 or 300 feet away, and just as plaintiff was in the act of trying to cut the wire, he hallooed at him not to do so.

Dave Gray testified that while he was going to the place, he saw the plaintiff on the pole, and called to him not to touch the wire; and George Reynolds, who was ascending the telephone pole across the street, testified that he hallooed to the plaintiff not to try to cut the wire, and to wait until they got a hand axe. But the plaintiff testified that he heard none of the warnings referred to.

So, it will be seen that upon the question of warning there was a conflict in the testimony, and therefore the trial court had no right to assume that the plaintiff was warned before he attempted to remove the wire. And the same may be said in reference to appellant's contention to the effect that the plaintiff must have known that the wire in question was charged with electricity, and therefore dangerous. Several witnesses testified that the wire was manifesting its vitality by writhing and twisting on the street, by making a popping noise, like a bunch of firecrackers, and by throwing off smoke and flames. If the plaintiff told the truth as a witness, none of the manifestations referred to were made after he reached the scene, or, if made, were not observed by him. It is true that his conduct, as well as his testimony, indicates that he thought the wire might have been charged with electricity; but he further testified that on account of the size of the wire he did not suppose that it carried more than 110 volts, which the testimony shows is not sufficient to cause serious bodily injury. He also testified that he thought that insulation would protect against injury on contact with a live wire, and further testified, in substance, that he thought that by getting off of the wet ground and placing his feet in contact with the wooden pole, he could thereby handle the wire in question without sustaining serious injury. Now, while some of his testimony, when considered in connection with the testimony of other witnesses, may seem to us improbable, it may be that his appearance on the witness stand, and his manner of testifying were such as to impress the jury with the belief that he was telling the truth. At any rate, while if the jury had reached the conclusion that he did not tell the truth in some of the matters referred to, such finding would not be set aside, still his credibility as a witness was a matter to be decided by the jury. And so it is, under well-settled rules of law,

that while this court, if required to decide the question of contributory negligence as an original proposition, might decide it otherwise as a question of fact, it does not follow that it should be held that the plaintiff was guilty of contributory negligence as a matter of law.

While not entirely analogous, there is some similarity between this case and Temple Electric Light Co. v. Halliburton, 136 S. W. 584, decided by this court, where the question of contributory negligence as matter of law is considered and discussed with some elaboration by Mr. Justice Rice, who prepared the opinion. It is a well-settled rule, announced by both text-writers and courts that, in all cases, and especially cases involving questions of negligence, the trial court should not direct a verdict unless the proof is so clear and strong as to leave no reasonable room for persons of average integrity and intelligence to draw different conclusions therefrom; and in at least one case our Supreme Court has held that a trial court should not give a peremptory instruction upon a question of negligence "except in cases where the evidence is so clear as to admit of but one answer to a rational mind." Mills v. Railway, 94 Tex. 242, 59 S. W. 874, 55 L. R. A. 497. The last-named case may state the rule too strongly, but the authorities are unanimous that, in order to justify a peremptory instruction, the evidence must be so strong as to leave no reasonable ground for divergent views among persons of average intelligence and fairness; but it seems to this writer that, as a logical result of that rule, if strictly adhered to, when a jury has passed upon a question of negligence and decided a particular way, that should be held to settle the proposition—that an appellate court should not hold the negligence involved to be a question of law upon the theory that there is no room for reasonable difference of opinion in reference to that question. A jury is supposed to be composed of men of average intelligence and fairness, and when they consider the testimony relating to a particular issue and decide it a particular way, and the members of an appellate court considering the same testimony reach a different conclusion, the finding of the jury and contrary finding of the appellate court would seem to demonstrate the fact that there was room for difference of opinion among fair-minded men of average intelligence and integrity. However, the courts do not so apply and administer the rule, but deal with it as stated by Judge Thompson in vol. 1, § 188, of his treatise on Negligence, as follows:

"It must be apparent that this rule in the concrete means no more or less than this: That when the fair-minded man on the bench thinks he is better capable of deciding the question than the 12 fair-minded men in the jury box, he will decide it without taking their verdict upon it. There are different ways of stating the doctrine, but they all come back to the conclusion just stated: The judge will submit the question to the jury where he (the judge) cannot positively say that the plaintiff was guilty of contributory negligence; or where there is any doubt upon the subject (that is to say, doubt in the mind of the trial judge, or in the minds of the judges of the court of appeal); or, stated negatively, the judge is not warranted in withdrawing the question from the jury unless the proof of contributory negligence is so clear and decisive as not to leave room (in his opinion) for impartial and unbiased minds to arrive at any other conclusion."

In considering whether a question of negligence is one of law to be decided by the court, or one of fact to be submitted to the jury, it should be borne in mind that, as a general rule, the test by which to determine whether or not a particular act or omission constitutes negligence is speculative, indefinite, and flexible. In other words, with some exceptions, in determining whether or not the matter complained of constitutes negligence, the law requires the conduct so complained of to be compared with what the jury may believe would have been the conduct of a person of ordinary prudence under the same or similar circumstances. What such a person would have done under like circumstances cannot be determined like a problem in mathematics. but is a matter of speculation and conjecture based upon common knowledge and the observation and experience of those who are required by law to pass upon the question. And the same may be said in determining whether, under a given state of facts, negligence is a question of law or a question of fact. In other words, whether or not the testimony leaves room for difference of opinion among men of ordinary, or average, intelligence and fairness is largely speculative, because there is no scientific rule or absolute method by which to determine precisely how much intelligence and fairness is required to constitute the ordinary or average man. Therefore, in determining whether or not, in a given case, the testimony renders the issue of negligence a question of law to be decided by the court, or a question of fact to be decided by the jury, two indefinite and speculative standards are to be applied; one in relation to the question of negligence, and the other in determining whether or not the testimony leaves room for difference of opinion among persons of ordinary, or average, intelligence and fairness.

Keeping in mind the thoughts above expressed, and the fact that a jury of 12 men have decided that appellee acted as a person of ordinary prudence would have acted on the occasion in question, we are not prepared to say, as a matter of law, that the facts proved by undisputed testimony clearly show that he did not so act.

It may be conceded that this case is near the border line and within the twilight zone between what constitutes a question of law and a question of fact; but, after giving it careful consideration, we have reached the

conclusion that it was not a question of law, but a question of fact, and that the court did not err in refusing to instruct a verdict for the defendants.

On the subject of contributory negligence the court gave fair and reasonably full instructions, which required the jury to decide whether or not the plaintiff was guilty of negligence in attempting to remove the wire from the street in the manner in which he attempted to do so; and we are not prepared to say that the verdict, finding that he was not guilty of such negligence, is not supported by testimony.

There are some other questions presented in appellants' briefs, all of which have been duly considered and are decided against appellants.

No reversible error has been shown, and the judgment is affirmed.

Affirmed.